TEMPLETON *v.* TWITTY.

(*Nashville.* March 1, 1890.)

1. VOLUNTARY CONVEYANCE. *Of husband to wife valid.*

Voluntary conveyance of land from husband to wife is valid, and will be upheld in a contest between the husband's and the wife's heirs. Creditors of husband alone can impeach such conveyance.

Cases cited: Hollingsworth *v.* Miller, 5 Sneed, 473; Wade *v.* Cantrell, 1 Head, 346.

2. SAME. *Same. Case in judgment.*

Husband held title-bond for land. His vendor had purchased it at chancery sale, but had taken no deed. Husband entered into written contract with his wife, in which his vendor joined, relinquishing to the wife all his "right, title, claim, and interest" in the land, and directing that title should be vested in her, and that the Clerk and Master's deed be made accordingly. Husband and wife went into possession under wife's claim. Before deed was made the husband and wife died, leaving distinct sets of heirs. Wife died first.

*Held:* That wife took a valid equitable title, which, upon her death, was inherited by her heirs, to the exclusion of the husband's heirs, but subject to his tenancy by the courtesy.

3. SAME. *Delivery of contract.*

It is a sufficient delivery of the written contract, in such case, that it was left in the possession of the husband's vendor. It could be properly lodged with any one of the contracting parties.

4. SAME. *Registration of contract is not essential.*

It is not essential to the validity of such written contract, as between the parties to it and their heirs, that it should be registered or acknowledged for that purpose.

Templeton *v.* Twitty.

5. STATUTE OF LIMITATIONS. *Effect of joint possession of husband and wife.*

Joint possession of land by husband and wife, held under the wife's color and claim of title, inures to her benefit.

6. SAME. *Remainder-man protected pending life estate.*

Statutes of limitation do not begin to run against remainder-man until termination of the life estate.

Cases cited: Miller *v.* Miller, Meigs, 484; McCorry *v.* King, 3 Hum., 267; Aiken *v.* Suttle, 4 Lea, 109; Garth *v.* Fort, 15 Lea, 688; 4 Johns. Ch., 390; 5 Cowan, 74.

7. TENANCY BY THE COURTESY. *Essentials to its existence.*

Four things are essential to the existence of the right of tenancy by the courtesy, to wit: (1) Marriage, (2) seizin of wife, (3) birth of issue alive, (4) death of wife.

8. SAME. *Sufficient seizin of equitable estate to support tenancy by courtesy.*

The surviving husband takes an estate by the courtesy in lands to which the wife acquired an equitable title, and of which she took possession jointly with her husband claiming under her muniment of title and for herself.

9. SAME. *Seizin and issue need not co-exist.*

It is not essential that issue should be living at the time the wife's seizin accrues, or during its continuance. Where issue capable of inheriting the land from the wife, if it had survived her, has been born alive and dies before the wife's seizin accrues, the husband's estate by the courtesy will nevertheless arise.

Case cited and distinguished: Haywood *v.* Moore, 2 Hum., 584.

---

FROM LINCOLN.

---

Appeal from Chancery Court of Lincoln County. W. S. BEARDEN, Ch.

CARMACK & WOODARD and A. S. MARKS for Complainants.

HOLMAN & CARTER for Respondents.

CALDWELL, J. This is a suit to recover certain lands lying in Lincoln County.

In 1852 Miss Eveline A. Templeton intermarried with Mr. Pinkney L. Twitty. At the time she owned a negro woman and child, which her aunt had previously given to her. Soon after the marriage the negro woman gave birth to another child.

Twitty and his wife regarded and treated these three slaves as her individual property, though they were never in fact formally settled upon her to her sole and separate use.

When married, and for several years thereafter, Twitty was an overseer for others, and had no home of his own. Becoming dissatisfied with that manner of living, and after much consultation between them, he obtained his wife's consent to sell her slaves and invest the proceeds in land for a home, with title in her name. In pursuance to that agreement the negroes were sold, October 24, 1856, for $2,000 on a credit.

Some of the money so realized was used in the purchase of what is known in the record as the Hicks and Seely lands. A few months later, October 20, 1857, at the suggestion of Mrs. Twitty, those lands were exchanged with Calvin L. Hodge

for another tract, containing seventy-five acres; and she and her husband went immediately into the possession and occupancy of the latter tract, and continued to reside upon it until her death.

For some unexplained reason Hicks conveyed his land to *Twitty*, and when the exchange was made Hodge, by his bond, bound himself to make title to *Twitty*, the wife of Twitty not being mentioned in either instrument.

Whatever the legal effect may have been, the testimony demonstrates that neither Twitty nor his wife supposed that her rights were prejudiced by the terms of the deed or title-bond. In fact, it is not affirmatively shown that either of them knew that the papers were executed to him and not to her.

The seventy-five acres sold by Hodge were composed of two smaller tracts, containing sixty-six and nine acres respectively. He had absolute title in fee to the nine acres, and, on April 6, 1861, conveyed it "to Eveline A. Twitty, wife of Pinkney L. Twitty, her heirs and assigns forever, for the consideration of $148.50." The sixty-six acres he had purchased at chancery sale, but had not yet obtained title; consequently he was not able to embrace it in the deed to the nine acres.

September 15, 1867, the civil war having intervened, a written "agreement" was executed by and between Hodge and Twitty and his wife, wherein it was recited that Hodge had purchased the sixty-six acres of land at a chancery sale, and that he had

paid all the purchase-money, which, by the terms
of the decree of the Chancellor, entitled him to a
deed from the Clerk and Master. The conclusion
of that agreement is in these words: "Therefore,
we, the said Calvin L. Hodge, P. L. Twitty, and
Eveline A. Twitty, do agree that the Clerk and
Master make a deed to Eveline A. Twitty, wife
of P. L. Twitty; it is the request and agreement
of P. L. Twitty that the deed be made to his
wife, Eveline A. Twitty, for the reason that the
purchase-money was paid out of her funds. The
said Hodge agrees, for the consideration of $1,000,
paid to him by the said P. L. Twitty, to relin-
quish all the right, title, claim, and interest he
has in and to said land, and to have the title vested
in the said Eveline A. Twitty. The day and date
above written.

"(Signed)              "CALVIN L. HODGE,
                       "P. L. TWITTY,
                              her
                       "EVELINE ⋈ A. TWITTY."
                              mark.

Two days later—October 26, 1867—Susanna and
Nancy Childress conveyed to "Eveline A. Twitty
and her heirs, for the consideration of $242," an
adjoining tract of land containing twelve acres.

Mrs. Twitty and her husband used all these
lands until August 19, 1878, when she died with-
out child or children surviving. After her death
P. L. Twitty married Defendant Martha, who, with
their five young children, survived him, and were

left in possession of the lands in question when he died on December 18, 1888.

W. W. Templeton and other brothers, sisters, and heirs of Eveline A. Twitty, deceased, brought this bill, April 13, 1889, against Martha Twitty, the second wife and widow of P. L. Twitty, deceased, and their children, to recover the said lands.

Proper answers were filed, and voluminous proof was taken. On final hearing the Chancellor adjudged that complainants, as heirs of Mrs. Twitty, deceased, were owners of the nine and twelve acres of land, and awarded writ of possession for them; but relief was refused and the bill dismissed as to the sixty-six acres.

Complainants appealed from so much of the decree as was adverse to their claim.

It is not important to decide whether the marital rights of P. L. Twitty attached to the negroes, or whether the Courts would have denied his power to relinquish those rights in favor of his wife (as in *Hollingsworth* v. *Miller*, 5 Sneed, 473, and *Wade* v. *Cantrell*, 1 Head, 346) as against creditors, because it is not shown or claimed that he had any creditors. For the same reason it is unnecessary to inquire whether creditors could have followed the proceeds and subjected the lands purchased as his property. Certain it is that he had the legal right to settle either the negroes or the lands upon his wife, creditors being out of the way.

It has already been stated that there was no formal settlement of the negroes, as such, though

they were to the last considered and held as her individual property. When sold, however, it was distinctly agreed that the land to be purchased with the proceeds should belong to her and be taken in her name; and, from the facts disclosed, it cannot be doubted that he intended and endeavored to carry out the agreement in good faith. This agreement was at the time in parol, but in fulfillment of it, and for no other purpose, the title to the Childress land and to nine acres of the seventy - five - acre tract was vested in Mrs. Twitty. It is just as certain that it was intended by all concerned that she should have the residue of the latter tract, and that it would have been conveyed to her when the deed to the nine acres was executed if Hodge, the vendor, had then been able to pass the legal title.

Subsequently, after he had paid into the Chancery Court all that he owed for the sixty-six acres, and thereby became entitled to a deed, Hodge joined in the execution of the paper already mentioned, whereby he relinquished to her all his "right, title, claim, and interest" in and to the said sixty-six acres, and agreed "to have the title vested in the said Eveline A. Twitty."

This instrument, in this aspect alone, was sufficient in its terms and import to divest Hodge of his equitable title and to invest Mrs. Twitty with it. If no further provision had been made for the perfection of her right, under this alone she could rightfully have demanded and received the legal title from the Clerk and Master.

But that is not all of the instrument. It con-tains another provision equally conclusive of Mrs. Twitty's right. It recites a "request and agree-ment" on the part of Twitty that the Clerk and Master shall make the deed to his wife, "for the reason that the purchase-money was paid out of her funds." Here is a distinct settlement of the land upon the wife, which the husband had the legal right to make, and also an unequivocal re-cital that the purchase-money was paid by her, which operates as an estoppel on him and his heirs alike to deny the truth of the facts recited.

Hence, the conclusion is inevitable, on more grounds than one, that Eveline A. Twitty was the equitable owner of the sixty-six acres of land, as a part of the product of "her funds," and that she could, at any time after September 15, 1867, have maintained a bill in chancery, and thereby acquired the legal title.

That the instrument last referred to was, after execution, left in possession of Hodge, and found among his old papers after the death of all the signers, cannot impair its force and validity. It was such a paper as might have been lodged with any one of the three parties without impairment of its legal effect, and without raising any presumption that it was abandoned or not completed. Obviously, possession by Hodge affords no ground upon which non-delivery can be justly assumed, for he might properly have held it as evidence of Twitty's agreement and request that the legal title be made

to his wife. Hodge's title-bond bound him to make title to Twitty; therefore, when he agreed to have title made to another, it was well for him to preserve his authority for so doing.

Again, it is said, as against the validity and effectiveness of the instrument in question, that its execution was not acknowledged before any officer, or attested by witnesses called for that purpose. This criticism is true as to the facts, but the legal result contended for does not follow. Such proofs are required only when registration is necessary to the protection of the beneficiary. That was not essential in this case. Even the most formal conveyances of land are effective between the parties without registration. After execution and delivery, without more, the instrument bound P. L. Twitty and Hodge, both of whom were *sui juris*, as effectually as if formally authenticated for registration; and as to the married woman, it would have been good if she had not signed it at all, because her attitude was that of vendee or grantee only.

The contemplated deed to Mrs. Twitty was never obtained, though she lived nearly eleven years after the agreement to have it made to her. During that period her husband called more than once to get it, but in every instance the Clerk and Master deferred making it on account of press of other business—always promising, however, to make it at some future time. On different occasions Twitty spoke of the "agreement" as a *quitclaim* deed from Hodge to his wife, and it may be that both

he and she, resting in that belief, were less solicitous about the Master's deed than they would otherwise have been.

It is true, as adjudged by the learned Chancellor, that possession was taken under the title-bond of Hodge to Twitty; but we do not concur in the opinion that the holding continued to be under that title-bond, and for Twitty instead of his wife. On the contrary, it is entirely manifest to our minds, from facts already stated and from others not necessary to be mentioned in detail—including declarations of Twitty himself—that the holding, up to the time of her death, was always in her name and for her benefit. This was properly and legally so after the execution of the writing of September 15, 1867, by which Hodge relinquished to her all his "right, title, claim, and interest," and agreed to have the legal "title vested" in her, upon the authority of Twitty, given in consideration of the fact that her money had paid for the land. The obligation of Hodge to make title to Twitty was superseded at that time, and the possession was thenceforth in law, as well as in fact, under the later instrument.

Besides denying that Eveline A. Twitty ever owned the land in controversy, the defendants rely upon seven years' adverse possession as a bar to this action. They make out the time, and more, by showing that P. L. Twitty, through whom they claim, was in possession of the land from her death, in August, 1878, until his own death, in De-

cember, 1888; and that they remained in possession, claiming for themselves, from his death until the filing of this bill, in April, 1889—in all ten years and eight months.

Counsel for complainants meet this defense, and say that P. L. Twitty was entitled to hold as tenant by the courtesy, and that for that reason the time of his possession cannot be counted, and without it the period of the statute is not made out. If it be established that he had an estate of courtesy, then the rest of the proposition is undeniably true. The statute of limitations does not run against a remainder-man until the falling in of the life estate; because until that time the life tenant and not the remainder-man is entitled to the possession. *Miller* v. *Miller*, Meigs, 484; *McCorry* v. *King's Heirs*, 3 Hum., 267; *Aiken* v. *Suttle*, 4 Lea, 109; *Garth* v. *Fort*, 15 Lea, 688; *Jackson* v. *Shoonmaker*, 4 Johns. Ch., 390; *Jackson* v. *Johnson*, 5 Cowan, 74.

Courtesy is considered a continuance of the inheritance of the wife for the life of the husband, and is said to have had its origin in his obligation to support the children. Its essential requisites are: (1) Marriage, (2) seizin of wife, (3) birth of issue alive, and (4) death of wife. The fact of the first and fourth in this case is conceded, but the sufficiency of the second and third —especially of the third—is controverted by counsel for defendants. From what has already been said, it would seem beyond reasonable debate that

her seizin was perfect, under the liberal construction of the present day or the stricter rule of the ancient common law; the only question, beyond that, being whether she was the *legal* or simply the *equitable* owner of the land. She certainly had an equitable title, and we are inclined to the opinion that it was ripened into a legal one by long possession. The latter point need not be decided, however, for the right of courtesy attaches to equitable as well as legal estates of inheritance. 1 Wash. R. P. (4th Ed.), 165, Sec. 8; 4 Kent (11th Ed.), 30.

During the coverture P. L. and Eveline A. Twitty had two children born unto them—a boy and a girl, the former dying July 17, 1857, at the age of about four years, and the latter dying August 4, 1857, at the age of about three years. Both children were born and died before their mother acquired any land; and, for this reason, it is said that their father could not have taken an estate as tenant by the courtesy. In other words, the contention in behalf of defendants is that because the wife's seizin did not commence until after the death of her children there was no right of courtesy in her husband.

All the authorities of which we have any knowledge are contrary to this contention. Whether seizin arose before or after the death of the child is an unimportant circumstance. If there was a child which by possibility might have inherited the land from the mother—a child to whom the

land would have descended had it survived the mother—that is all that is required as to issue, and the father takes an estate for life as tenant by the courtesy.

Coke (Vol. I., 30*a*), after enumerating the four things necessary to an estate of tenancy by the courtesy, says: "But it is not requisite that these should concur together all at one time. And, therefore, if a man taketh a woman seized of lands in fee, and is disseized, and then have issue, and the wife die, he shall enter and hold by the courtesy. *So, if he hath issue which dieth before the descent,* as is aforesaid."

In 1 Cruise Dig., 147, Sec. 7, the same rule is laid down in this language: "The time when the seizin commences, whether before or after issue had, is immaterial; for if a man marries a woman seized in fee, is disseized, and then has issue, and the wife dies, he shall enter and hold by the courtesy. So, if he has issue *which dies before the descent of the lands on the wife.*"

Chancellor Kent says: "Tenancy by the courtesy is an estate for life created by the act of the law. When a man marries a woman seized at any time during the coverture of an estate of inheritance in severalty, in coparcenary, or in common, and hath issue by her born alive, and *which might by possibility inherit the same estate* as heir to the wife, and the wife dies in the life-time of the husband, he holds the land during his life by the courtesy of England; and *it is immaterial whether*

*the issue be living at the time of the seizin,* or the death of the wife, or whether it was born before or after the seizin." 4 Kent, 26 (11th Ed.).

By another distinguished American author it is said: "It is immaterial whether the child is born before or after the wife acquires her estate, *if, had it lived, it would have inherited that estate; and it matters not though it die before she acquires the estate,* so far as the husband's right to courtesy is concerned." 1 Washburne, R. P. (4th Ed.), pp. 178 and 179, Sec. 45.

In the celebrated case of *Johnson* v. *Johnson,* 5 Cowan, at page 102, Chief Justice Savage says: "It is immaterial at what period during coverture the wife became seized, whether before issue or after; *nor is it material whether the issue be living at the time of the seizin.*"

The italics in these several quotations are ours. Numerous other authorities to the same point might be cited; but those mentioned are sufficient to sustain our holding.

. Our own case of ·*Haywood's Heirs* v. *Moore,* 2 Hum., 584, is not in conflict, though the claim of courtesy was refused in that case. There Mrs. Moore and her only child took the land under the same deed—both as purchasers, she a life estate and he the remainder. He dying first, she, by the terms of the statute, became vested with his estate in remainder, because he had "derived" it from her—that is, because her money had paid for it in the first instance. Then, she received the estate

to which it was contended the courtesy of the husband attached, from her son upon his death, and not otherwise. The son could never by possibility have inherited this estate from his mother, for the reason that he must die before she could take it. Had he survived her he would have come into his estate under the deed as purchaser, and not by inheritance from her.

In no event could he have taken the estate as heir of his mother; hence, it was well decided that the husband had no courtesy.

As applied to the facts of the case, the language of the opinion, as well as the decision, is entirely sound, and in harmony with other authorities. The decision was, by Judge Green, speaking for the Court, put distinctly upon the obvious proposition that the *son of Mrs. Moore could never by possibility have inherited the particular land from his mother.* As an illustration he uses the case given by Blackstone (2 Black. Com., 127, 128), as follows: "If a woman be tenant in tail male, and hath only a daughter born, the husband is not thereby entitled to be tenant by the courtesy; because such issue female cannot inherit the estate in tail male."

In the present case the children of Eveline A. Twitty would have inherited from her the land in controversy if they had outlived her. Therefore, her husband had an estate as tenant by the courtesy—initiate on the birth of issue and consummate on the death of the wife.

39—4 P

His possession for ten years and four months was in virtue of his own tenancy, and rightful in the fullest sense. No statute of limitations operated during that period.

Reverse decree as to the sixty-six acres, and enter recovery in favor of complainants, awarding writ of possession. Defendants will pay all costs.